**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Linda Ruffin, | ) | CASE NO. 1:16 CV 640 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Cuyahoga County, et. al., | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Defendants. | ) | |

This matter is before the Court upon Defendants the MetroHealth System, Dr. Thomas

Tallman, and Elizabeth Kempe, CNP's Motion for Summary Judgment (Doc. 81); Defendants

Cuyahoga County, Marcus Harris, RN, and Corrections Officer Zackary Anderson's Motion for

Summary Judgment (Doc. 87); and Defendants Cuyahoga County, Marcus Harris, RN, and

Zackary Anderson's Motion to Strike Non-Evidentiary Materials Cited in Plaintiff's Opposition

to Summary Judgment and Motion to Quash Subpoena to Defense Expert, Jeff Eisner (Doc. 107)

This is a civil rights dispute. For the reasons that follow, Defendants' motions for summary

judgment are GRANTED. The Cuyahoga County Defendants' motion to strike and motion to

quash is GRANTED in part and DENIED in part as moot.

1

## FACTS

This case arises out of the death of Robert Sharp on March 26, 2015, while he was an inmate at the Cuyahoga County Corrections Center. Sharp's mother, as the administrator of his estate and individually, brings suit against Cuyahoga County, the MetroHealth System, nurse Marcus Harris, Corrections Officer Zackary Anderson, Dr. Thomas Tallman, and nurse Elizabeth Kempe.[1] Plaintiff seeks compensatory and punitive damages.

Sharp was admitted into the jail on March 24, 2015. The next day, Sergeant William Brewer received information from an inmate that Sharp had secreted heroin in his anal cavity, known colloquially in the corrections community as "keistering" heroin. (Brewer Dep. at 15-16, 24, 31); (*see also* Metz Report, Pl.'s Ex. 27) (noting that another inmate reported that Sharp and inmate Bryan Cross "had keistered several other bags of the white powder like substance"). Sgt. Brewer ordered a shakedown of the pod. (Brewer Dep. at 24). Sharp was then transported to the medical dispensary at 10:48 a .m. on March 25, 2015, to be assessed by medical personnel. Sgt. Brewer visited the dispensary after the shakedown and advised Janet Hodgson, the charge nurse, that inmates Brian Cross and Robert Sharp were in the dispensary for treatment because there was a possibility they had keistered drugs. (*Id.* at 15). Nurse Hodgson asked Elizabeth Kempe, a certified nurse practitioner in the dispensary, "to order an x-ray to rule out a foreign body in [Sharp's] rectum." (Kempe Dep. at 10-12); (Doc 100-7, Pl.'s Ex. 4, at 8) ("CO staff requesting

---

[1]      Marcus Harris and Zackary Anderson are employees of Cuyahoga County, and Thomas Tallman and Elizabeth Kempe are employees of MetroHealth System. Plaintiff also sued Clifford Pinkney, the Cuyahoga County Sheriff, Corrections Corporal Huerster, and Jane and John Does 1-13. On August 31, 2016, this Court dismissed the claims against Sheriff Pinkney. Plaintiff voluntarily dismissed Corporal Huerster on September 23, 2016. Plaintiff never identified any Jane or John Doe.

confirmation of possible FB in rectum").

Sharp's medical records note that he was oriented to person, place and time and noted "no distress" when he arrived in the dispensary. (Doc. 100-7, at 7). He was also able to walk in and out of the rooms in the dispensary and communicate with staff. (Luethy Dep. at 78). Nurse Kempe told Sharp that they would be taking an X-ray of him because it had been reported that he "put some thing up [his] rear end." (Kempe Dep. at 13-14). According to Kempe, Sharp responded that "he didn't do drugs and...wasn't involved in this...and that he didn't take and put anything up his rectum." (*Id.* at 14). Despite Sharp's denial, Nurse Kempe ordered the X-ray. (*Id.*).

Three X-ray images were taken of Sharp's abdomen. A radiologist at MetroHealth interpreted the films and found nothing abnormal. (Tallman Dep. at 28, 34-37). The findings were transcribed into Sharp's chart. (Doc. 100-7, at 8). Kempe also added a note to the chart that inmate Cross had admitted to having a foreign body in a cavity. (Kempe Dep. at 3l).

When nurse Marcus Harris came into the dispensary, he cannot recall if anyone told him that the inmates had keistered drugs, but he operated under that assumption because SRT[2] was in the dispensary. (Harris Dep. at 44-45). As a precautionary measure, Harris administered magnesium citrate, a laxative, to Sharp at 2:03 p.m. to induce a bowel movement. (Harris Dep. at 23); (*see also* Hodgson Dep. at 113). When Harris administered the magnesium citrate to Sharp, Sharp told him, "I ain't got nothing, I didn't do nothing," but Harris did not note the conversation in the record. (Harris Dep. at 45-46). Sharp was given a tool to collect his stool,

---

[2]     Although Harris did not clarify what "SRT" stands for in his deposition, the Court assumes that it refers to "special response team."

(Dancie Dep. at 50-51); (Hodgson Dep. at 76-77), and he went in and out of the bathroom, (Luethy Dep. at 66). At the time Harris administered the laxative, he did not think that Sharpe "was believed to have swallowed anything. [He] thought all of them were keistered." (Harris Dep. at 45). Harris testified that it is not uncommon for prisoners to swallow or keister illegal drugs or objects. (*Id.* at 29-30, 36).

Two Medical Technical Assistants (MTA"), Lillie Gill and Renee Dancie, testified that they observed Sharp in the dispensary. According to Gill, SRT Jonas informed her that Sharp was in the dispensary for drugs. (Gill Dep. at 13).[3] Sharp "didn't look too good" and was "sweaty." (*Id.* at 33-34, 59). She also heard him state that he did not feel well. (*Id.*) Sharp did not say it directly to anyone but was sitting out in the open where other nurses and staff were around him. (*Id.* at 34-35) ("I think Marcus was there. There was a lot of people just coming in. I can't even recall. But as far as around me, those are the people that was around me."). Gill reported to the charge nurse that she had heard Sharp say he did not feel well. (*Id.* at 34). She cannot recall who the charge nurse was that day but "believe[s]" that it was Janet Hodgson. (*Id.* at 70-71). The charge nurse told Gill that they were about to do something with Sharp and had it under control. (*Id.*). Gill was not able to recall the precise time that she made her observations about Sharp.

Dancie also testified that Sharp did not look well, that his head was hanging low, and that

---

[3]    Plaintiff misleadingly states in her briefing that "Gill stated that when Sharp was brought in she was told by SRT Jonas that Sharp was there because he was suspected of swallowing heroin." (Doc. 98, at 12). This is not true. Gill testified in her deposition that the only information she had from Jonas was that Sharp was in the dispensary for drugs. (Gill Dep. at 13). She went on to say that "it was more so talked about that he may have swallowed some heroin, I believe." (*Id.* at 13). But she does not identify in her deposition who was involved in these conversations or when they occurred.

she overheard him say that he was not feeling well. (Dancie Dep. at 10). Dancie made her observations about Sharp's appearance after Harris stated that he would administer magnesium citrate to Sharp. (*Id.* at 15-17). Dancie did not report her observation to a nurse or speak to Sharp, and she played no role in his care. (*Id.* at 9, 17). She was not present when he was brought to the dispensary, did not hear directly what he was there for, and did not have any conversation with anyone who was directly providing care to him. (*Id.* at 35-36). She did not know whether he was in possession of any drugs, did not know what he was suspected of having, and did not know where he was suspected of having it in his body. (*Id.* at 40). Although she testified that she "heard ... the talk [was] that he probably swallowed something or they thought he swallowed something," it is not clear from her testimony when she heard such "scuttlebutt discussion amongst the workers on the floor." (*Id.* at 23, 36).

Sharp's medical records do not include a notation that he had a bowel movement. (Kempe Dep. at 37); (Harris Dep. at 78-79). Dr. Tallman, however, testified that he spoke with "the provider,"[4] who informed him that Sharp had had a bowel movement and that it had been inspected. (Tallman Dep. 60-61). Sharp was cleared to leave the dispensary and return to lockup. (Tallman Dep. at 61, 73); (Brewer Dep. at 55-57). At 4:25 pm., Sharp left the dispensary with a corrections officer. (Mancini Report).

Sgt. Brewer placed Sharp in "administrative detention pending investigation." (Brewer Dep. at 42, 49). He was housed in a single person cell in a pod where a corrections officer conducts observation rounds every ten minutes. (Brewer Dep. at 72-73); (Anderson Dep. at 87).

---

[4] Dr. Tallman does not identify which "provider" he spoke with. (Tallman Dep. at 61).

The purpose of the rounds it to check on the safety of the inmate, to discover and confiscate any contraband, and to hear any inmate complaints or medical requests. (Anderson Dep. at 92); (Metz Dep. at 28-29). Zackary Anderson was a corrections officer on duty in Sharp's pod. During his rounds, he would pause at the inmates' cells, including Sharp's, for five to ten seconds for observation. (*Id.* at 92-93). Officer Anderson conducted a sweep of Sharp's cell at 6:40 p.m. on March 25, 2015. At this time, Sharp told Anderson that he had had a bad day and that he was "up here under false allegations." (*Id.* at 109). He also requested a Bible. (*Id.*). Sharp did not say anything about ingesting heroin and did not tell Anderson that he was not feeling well. (*Id.*). He also did not call for Anderson or request aid throughout the night. (Anderson Dep. at 85, 108).

The next morning at 5:29 a.m., Anderson entered Sharp's cell to deliver breakfast. (*Id.* at 88, 90). He found Sharp unresponsive and without a pulse. (*Id.* at 88) Anderson called out a medical emergency on his radio. (*Id.* at 89). Corporal Huerster arrived first and began to administer CPR. (*Id.* at 90). Medical staff then arrived in the unit and took control of the situation. (*Id.* at 88-89). EMS arrived at 5:44 a .m. and began to assist. EMS continued to provide resuscitative efforts including four doses of epinephrine, but Sharp was unresponsive. Sharp was transported by EMS to Lutheran Hospital at approximately 6:20 a .m. He was pronounced dead at 6:32 a.m. on March 26, 2015.

The Cuyahoga Medical Examiner's Office discovered a baggie of heroin inside Sharp's small intestine. (Gilson Dep. at 34-35). The location of the baggie indicated that he had ingested it. (*Id.* at 47). The medical examiner determined that Sharp died of an accidental heroin overdose. (Medical Examiner's Verdict.). According to Dr. Gilson, prior to his death, Sharp's

breathing would have progressively slowed until he eventually stopped breathing. (Gildon Dep. at 40). Additionally, there would have been visual clues, including that he would become sleepy, his pupils would pinpoint, he would have labored breathing, he would start snoring, and he would be difficult to arouse. (*Id.* at 41, 43, 44).

This lawsuit followed. Plaintiff brings five causes of action. Count One is a § 1983 claim against Cuyahoga County, The MetroHealth System, Dr. Tallman, Marcus Harris, Elizabeth Kempe, and Officer Anderson. Count Two is a wrongful death claim against Cuyahoga County, The MetroHealth System, Dr. Tallman, Marcus Harris, Elizabeth Kempe, and Officer Anderson. Count Three is a negligence claim against Cuyahoga County, the MetroHealth System, Dr. Tallman, Marcus Harris, and Elizabeth Kempe. Count Four is a malpractice claim against Dr. Tallman. Count Five is a negligence claim against Elizabeth Kempe.[5]

## **MOTION TO STRIKE**

The Cuyahoga County Defendants move to strike Plaintiff's submission of the transcript of oral statements that inmates Hill, Cross, and Young gave during the investigation of Sharp's death. Defendants argue that the statements are hearsay. Defendants' motion is denied as moot. As discussed below, Defendants are entitled to judgment as a matter of law because no reasonable jury could find that the Individual Defendants violated Sharp's clearly established constitutional rights. Plaintiff has not identified anything in the inmates' statements that creates a genuine dispute of material fact. To the contrary, inmate Hill's statement is consistent with other

---

[5]     Plaintiff originally brought Count One against Corporal Huerster and the John Does, Count Two against Clifford Pinkney, Corporal Huerster, and the John Does, Count Three against Clifford Pinkney and the John Does, and Count Five against John Does 6-13. As noted above, Corporal Huerster and Clifford Pinkney have been dismissed, and Plaintiff never identified any of the John Does.

evidence showing that, at most, the Individual Defendants were aware that Sharp had been alleged to have keistered–not swallowed–the heroin:

> Female Investigator: So [Sharp] goes into the area to be searched first?
> Inmate Hill: Yeah.
> Female Investigator: When he comes out, did he give any–other than you saying that the CO didn't search him, did he give any indications as if he could hid[e] it up, put it up his ass, swallowed it?
> Inmate Hill: That's what he went in the bathroom to do, to put it up his ass. He said that.
> Female Investigator: He said he put it up his ass?
> Inmate Hill: He told [Cross] he better put his up his ass too. Its [*sic*] right on camera, the white boy (inaudible) this. I'm like, oh man.
> Female Investigator: So he told him to put it up his ass and he put his up his ass.
> Inmate Hill: He told him to put it up his ass. And then he came back and we were still in the holding cell. He came back, asked him to see the bag again, took a couple more pieces and then went back to the bathroom....

(Hill Tr. at 28). As discussed below, Defendants were not deliberately indifferent to Sharp's medical needs based on this knowledge.

The County Defendants also move to quash Plaintiff's subpoena to the County's jail procedures expert, Jeff Eisner. Because Defendants are entitled to summary judgment, the motion is denied as moot.

Finally, the County Defendants move to strike Plaintiff's references to "two mysterious phone calls" that Tiante Blackman, mother of two of Sharp's children, received shortly after Sharp died. In her opposition briefs, Plaintiff claims that Blackman received a phone call from someone who worked in the jail and who informed Blackman that Harris was "being nasty" to Sharp and that Harris refused to send Sharp out to get a better X-ray and instead said, "no, give him magnesium citrate and let him go shit his brains out, send him to isolation." (Blackman Dep. at 51). Blackman states that the person called back a second time with another nurse who worked at the jail. The callers told Blackman, "They brought him in to the dispensary, did an X-ray.

They seen something on the X-ray, they couldn't tell what it was." (*Id.* at 54).[6] Plaintiff claims

that she is using these statements to illustrate Harris's willful, wanton, reckless, and malicious

attitude and actions toward Sharp.

Defendants' motion is granted. The identity of the callers is not in the record, their

statements constitute hearsay, and the evidence that is in the record contradicts the callers'

statements. Plaintiff previously moved to reopen discovery, claiming that Joyce Besses was one

of the callers. The Court denied Plaintiff's request, explaining that Besses' affidavit suggested

that she does not have first-hand knowledge[7] of the events in question and that Plaintiff had not

identified any efforts that she had made during discovery to identify the callers. In addition,

Besses does not even aver in her affidavit that she ever called Blackman. She merely states that

she "became aware of information regarding [Sharp]." Blackman's statements regarding the

statements of two anonymous callers–who may or may not have first-hand knowledge regarding

Harris's and the other Defendants' interactions with Sharp–contain multiple layers of hearsay.

Moreover, the callers' statements regarding the X-ray results are contradicted by the evidence

that is in the record. All other evidence in the record is undisputed that the results of Sharp's X-

---

[6]      In her brief, Plaintiff implies that the callers told Blackman that they had seen something on the X-ray themselves. (Doc. 99, at 16) ("They [referring to the callers] both stated that they had seen something on the x-ray."). But it is apparent from Blackman's testimony that the callers were referring to someone else having seen something on the X-ray. (Blackman Dep. at 51) ("[T]hey did an X-ray, and in the X-ray they seen something in his X-ray, but they couldn't tell what it was.")

[7]      Besses' affidavit stated that, "[w]hile working as Union President for employees in the Cuyahoga Corrections Center, I became aware of information" regarding the interaction between the Center's Director of Nursing Marcus Harris and Sharp.

rays were negative; no foreign objects were visible. Similarly, the two MTAs, Renee Dancie and Lillie Gill, who were actually present in the dispensary when Sharp was being treated, testified only that Harris told Sharp "[s]omething about a cocktail. You're going to drink this cocktail, and you need to go to the bathroom then." (Gill Dep. at 36). Plaintiff does not point to anywhere in their testimony–or anyone else's–that Harris said that he was giving Sharp a "shit cocktail" or that he was sending him to isolation to "shit his brains out." Nor does she point to testimony by any other individual who substantiates her claim that Harris acted in a willful, wanton, reckless, or malicious manner toward Sharp.

## SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed-show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting summary judgment remain unchanged" and the amendment "will not affect continuing

10

development of the decisional law construing and applying" the standard.  *See* Fed. R. Civ. P. 56, Committee Notes at 31.

Accordingly, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a

scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

## LAW AND ANALYSIS

### A. Section 1983 claim against the Individual Defendants

To prevail on a cause of action under § 1983, a plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010) (internal quotation marks omitted). Here, there is no dispute that each of the Individual Defendants was acting under the color of state law at the time that Sharp was in the custody of the Cuyahoga County Corrections Center. Individual Defendants, however, argue that they are entitled to summary judgment because Plaintiff cannot show that they acted with deliberate indifference to Sharp's serious medical needs in violation of the Fourteenth Amendment.[8]

Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty. v. Brown*, 520 U.S.

---

[8] Because of Sharp's status as a pretrial detainee rather than an inmate, his § 1983 claim must be brought under the Fourteenth Amendment's due process clause. *Smith v. Erie County Sheriff's Dept.*, 603 Fed. Appx. 414, 425 (Batchelder, J., concurring). The Eighth Amendment's deliberate indifference standard, however, is applicable to his claim. *Id.* (citing *Burgess v. Fischer*, 735 F3d 462, 476 (6th Cir. 2013)).

12

397, 410, 117 S. Ct. 1382, 1391 (1997). It has both an objective and a subjective component. The objective component requires a showing of a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A claimant may satisfy the subjective prong by proving that "the official knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. To defeat summary judgment, a plaintiff must "make a showing sufficient to establish the existence" of deliberate indifference because the plaintiff bears "the onerous burden of proving the official's knowledge at trial." *Hinneburg v. Miron*, 2017 WL 218885, * 3 (6th Cir. Jan. 19, 2017) (internal citations omitted). To do so, the plaintiff must establish facts from which a reasonable juror could conclude that the official: (1) subjectively perceived the facts that gave rise to the inference of the risk; (2) actually drew the inference; and (3) consciously disregarded the perceived risk. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

"Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir.1994). While it is not enough for a plaintiff to show that an officer should have perceived a substantial risk to the detainee's health, she "does not need to show that the correctional officers acted with the very purpose of causing harm or with knowledge that harm will result." *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 541 (6th Cir. 2008) (quoting *Farmer*, 511 U.S. at 835).

1. Objective prong

The Individual Defendants do not dispute that Plaintiff can meet the objective prong in this case. Thus, the Court will assume that Plaintiff has met this prong and will analyze only whether the Individual Defendants had the requisite subjective culpability.

13

2. <u>Subjective prong</u>

A defendant's personal liability in a §1983 action "must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others." *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991). Thus, the deliberate indifference standard requires that the plaintiff show that each individual defendant had the necessary mental culpability based on the facts and circumstances known to that officer. *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005). On a review of the record, the Court finds that Plaintiff has failed to establish a genuine dispute of fact that any of the Individual Defendants had the requisite knowledge under the subjective prong.

The Sixth Circuit has analyzed a number of cases involving drug-overdose deaths while in custody. In such cases, the court "has found that the fact that officers know or should have known that a detainee ingested drugs is not enough to establish deliberate indifference." *Hinneburg*, 2017 WL 218885, at *4. On the other hand, correctional officers should be liable where they refused to "verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist." *Id.* (quoting *Border v. Trumbull Cty. Bd. of Comm'rs*, 414 Fed. Appx. 831, 838 (6th Cir. 2011) (citations omitted)); *Nelson v. Corrections Corp. of Am.*, 2016 WL 1060308, at *6 (N. D. Ohio Mar. 14, 2016) ("The Sixth Circuit has repeatedly found that officers are not liable for deliberate indifference to an inmate who died in their custody from a drug overdose where they had no actual knowledge of the overdose.")

In *Weaver v. Shadoan*, 340 F.3d 398 (6th Cir. 2009), for example, the Sixth Circuit held that officers were not deliberately indifferent when a detainee, who swallowed cocaine during a

police chase, became sick, vomited, lost consciousness, and then died. During the course of the arrest, the officers saw a lump in the detainee's pocket that they believed to be about the size of several rocks of crack cocaine. When the officers asked the detainee to empty his pockets, he ran. Once they caught up with him, the officers noticed that the lump was gone. They retraced the detainee's steps and found an empty cellophane wrapper that contained a residue that appeared to be crack cocaine. They also observed that the detainee appeared to have something in his mouth, but he refused to open his mouth and swallowed before they were able to determine what it was. When EMS personnel arrived at the police station where the detainee was being held, the officers requested that the EMTs examine the detainee for a possible drug overdose. Despite numerous offers of help by the EMTs, the detainee refused treatment and, when asked if he wanted to go to the hospital, he replied, "No, I want to go to jail, and I haven't taken nothing. Leave me alone." *Id.* at 403. The detainee was then moved to the county jail. En route, he vomited, and by the time he got to the jail, he was mumbling and unable to walk without assistance. He was placed in a jail cell, where it was fifteen to twenty minutes before anyone checked on him. By the time an ambulance arrived, he had lost consciousness and was not breathing. *Id.* at 404-405.  In reversing the district court's denial of summary judgment to the officers, the court reasoned that the officers did not see, or otherwise have knowledge, that the detainee had ingested cocaine, and he had repeatedly denied swallowing any drugs. When he appeared to become ill, they immediately summoned the paramedics, who determined that he did not exhibit any symptoms of drug ingestion. While waiting for the ambulance, one officer checked his heartbeat and breathing, an indication that he was concerned for the detainee's health. *Id.* at 411.

Similarly, in *Watkins v. City of Battle Creek*, officers executed a search warrant at the apartment of a suspected mid-level drug dealer. 273 F.3d 682 (6th Cir. 2001). Upon entry, they found the suspect exiting a walk-in closet. Inside the closet was a torn plastic bag with white crumbs sprinkled around it and nearby was a larger piece of white substance, which was later identified as crack cocaine. Officers saw him licking his lips and a pink foamy drool coming from his mouth. The officers also observed a white speck near his mouth. They did not, however, see him place drugs into his mouth. The suspect repeatedly denied swallowing any drugs and refused medical treatment. The officers did not inform the jailers or their supervisors of what they observed. Once at the jail, the suspect complained of an upset stomach and appeared to be intoxicated. He again rejected an offer of medical treatment. *Id.* at 684-85. At no time while he was conscious did the officers or jailers summon paramedics. Later, the suspect was found dead in his cell. The Sixth Circuit found that it was not enough for the plaintiff to demonstrate that the police officers should have known that the suspect had ingested cocaine. Because they did not see him ingest any cocaine, there was insufficient evidence to lead a rational trier of fact to conclude that the officers or jailers knew that he needed medical attention for drug ingestion. *Id.* The situation did "not involve an incapacitated detainee or one who asked for but was refused medical treatment." *Id.* at 685. *See also Hinneburg*, 2017 WL 218885, at *4 (defendants not deliberately indifferent to serious medical needs of detainee who died of hydrocodone intoxication because officers were only aware that detainee was intoxicated; they were unaware that she had taken hydrocodone earlier in the day)*; Smith v. Erie County Sheriff's* Dept., 603 Fed. Appx. 414, 420-21 (6th Cir. 2015) (officers' belief that detainee had merely consumed alcohol, rather than prescription medication, and was not in need of medical care was reasonable even

though prescription medication had been confiscated from her; detainee was able to walk and follow directions and had no apparent symptoms of having consumed prescription medication and jail staff observed detainee every twenty-five minutes); *Spears v. Ruth*, 589 F.3d 249 (6th Cir. 2009) (officer not deliberately indifferent to detainee's medical needs who died of a cocaine overdose even though officer knew that detainee had smoked crack and may not have informed EMTs and jail officers of the admission; officer was entitled to rely on EMTs' and jail nurse's medical assessment that detainee did not need to be transported to the hospital).

a. Nurse Kempe

Plaintiff claims that Nurse Kempe acted with deliberate indifference because she was merely asked by Nurse Hodgson to order an X-ray at the request of the administration and did not provide any further treatment. (Doc. 99, at 15). Plaintiff claims that Kempe obtained all of her information from Hodgson "and did not bother to obtain any information directly from Sharp" and did not interact with him even though she was the one treating him. (*Id.*). Plaintiff argues that Kempe admitted that it is the standard of care to send an inmate suspected of ingesting drugs to an emergency room and that she had the authority to send Sharp to the emergency department but did not do so. She also claims that Kempe did not place the order for an X-ray in Sharp's medical records so the radiologist would not necessarily have known to look for a plastic bag with drugs in it. (*Id.* at 16). Finally, she claims that Nurse Kemp did not order a urinalysis to screen for toxins. (*Id.*).

Contrary to Plaintiff's assertions, Kempe did speak with Sharp directly when she informed him (along with the other prisoners who had been brought to the medical dispensary) that he was going to have an X-ray done because it had been reported that he had hidden

something in his rectum:

> A: I went up to all the prisoners that were brought down for this and confirmed their names, that they were the correct patients. And I said, they're going to do an X-ray on you because it's been reported that you put something up your rear end.
> Q: And do you remember Mr. Sharp saying anything to you?
> A: Yes.
> Q: What did he say to you?
> A: He said he didn't do drugs, that he was not involved in this, and that he didn't do drugs and didn't–wasn't involved in this, you know, the area of everything that was going on and that he didn't take and put anything up his rectum.

(Kempe Dep. at 13-14); (*Id.* at 16) (noting that she talked with Sharpe after the X-ray about his frequent urination and informed him that "urine or something like that" had been ordered).

Plaintiff's assertion that Sharp's medical records do not contain any instructions regarding the purpose of the X-ray is also misleading. Kempe's "Progress Notes" in the records state "CO staff requesting confirmation of possible FB in rectum." Under "Clinical History," the notes state "possible fb in rectal area." (Doc. 100-7, at 8); *see also* (Kempe Dep.at 12) ("radiology knew that they were coming, and the X-rays needed to be ordered to rule out a foreign body").[9] Indeed, the X-ray findings state that "[n]o foreign objects are identified," indicating that the radiologist knew to look for a foreign object. (Doc. 100-7, at 8). Kempe testified that she reviewed the results of the X-ray when they came back. (Kempe Dep. at 17). She was also aware that nurse Harris was going to administer magnesium citrate to Sharp, and that another inmate who had been brought to the dispensary with Sharp had admitted to having a foreign object in a cavity. (*Id.* at 31, 36).

Based on nurse Kempe's knowledge, she did not act with deliberate indifference in not

---

[9] During Dr. Tallman's deposition, counsel for Dr. Tallman and nurse Kempe indicated to Plaintiff's counsel where these notations were in the medical record. (Tallman Dep. 49-50).

sending Sharp to the emergency department or ordering a urinalysis. Kempe did not observe Sharp ingest any drugs and knew only that he was suspected of keistering, not ingesting, drugs.[10] She also knew that the other inmate who had been suspected of hiding drugs in his body had keistered them. Sharp was coherent and able to communicate with her, and indeed, denied taking or keistering drugs when she spoke with him.[11] The results of his X-ray were negative, bolstering his denial. Finally, Kempe knew that Harris was going to administer magnesium citrate, which would have forced out any keistered bags. As other courts have found, prison officials "do not have to be mind readers, and ... can take a prisoner at their word when they say they did not take drugs and do not need healthcare." *Smith v. Pike Cty.,* 2008 WL 3884331, at *7 (E.D. Ky. Aug. 18, 2008), *aff'd* 338 F. App'x 481 (6th Cir. 2009). For these reasons, Kempe is entitled to summary judgment.

b. Dr. Tallman

Plaintiff's claim that Dr. Tallman had the requisite subjective knowledge is based on her assertion that he was aware that Sharp was suspected of having swallowed a bag of heroin. (Doc. 99, at 14). She claims that, despite this knowledge and the risk of serious harm to Sharp, Dr. Tallman did not personally examine Sharp and did not follow the standard of care and send Sharp to the emergency room where a cavity search or digital exam and drug or urine test could have been performed. She further claims that Dr. Tallman should have sent Sharp to the

---

[10]     In fact, Kempe testified that she *would* have sent him to the emergency department if she had known that he swallowed drugs. (Kempe Dep. at 42).

[11]     Though Gill and Dancie testified that they observed that Sharp did not look well and was complaining of not feeling well, neither of them testified that Kempe was aware of these facts.

emergency room for a CT scan, which could have possibly given a better image than an X-ray.

(*Id.*).

The record, however, does not support Plaintiff's assertion that Dr. Tallman was aware

that Sharp was suspected of having swallowed a bag of heroin. Indeed, Dr. Tallman testified

consistently that he was only aware that Sharp had possibly concealed contraband in his rectum:

> Q: [H]ere's what I'm asking you: what was the assumption in Mr. Sharp's case in ordering the X-ray?
> A: That an accusation by another officer that he possibly concealed something in his rectum. (Tallman Dep. at 41).
>
> Q: So what was the specific claim made by the officer in the jail?
> A: That they had searched their quarters, they found drug contraband, and we think that these guys are hiding it in their rectum. (*Id.* at 43).
>
> Q: [W]hat about doing the kind of radiological exam that can give you the best view of the intestinal tract?
> A: It depends on the suspicion....I think right now my suspicion is that we have an inmate that possibly put a drug, contraband in the rectum, and that was the whole concern that he was brought to the dispensary for....There was never any knowledge or information or suggestion by anybody that he swallowed anything. (*Id.* at 46, 47).
>
> Q: [A]t the time the X-ray was ordered for Robert Sharp, there were other options radiology-wise, correct?
> ***
> A: It's a matter of discussing a hypothetical versus a patient's case, that we use the information that we had at the time. That makes all the difference in the world. And based on the information that we had at the time it would not have been an indication to do a CAT scan.
> Q: Okay. So let's get that down. Tell me exactly what information you're saying you had at the time.
> A: That we were given the situation that Mr. Sharp and two others, they were suspected to have concealed drug contraband in the rectum. (*Id.* at 70).

Had Dr. Tallman suspected that Sharp ingested the heroin, he testified that Sharp would have

been sent to the emergency room:

> Q: Are people who have been suspected of having a balloon of heroin in their

system ever put on the medical pod for observation?
A: If we really suspected that they had a balloon of heroin inside of them, they would go most likely into the emergency department to be treated.

\*\*\*

Q: Okay. What if anything, during the time you've been there, has been done with respect to meeting the medical needs of people who may have ingested a balloon of heroin?
A: First of all, we have to have a story that confirms that that's actually occurred.
Q: And when you have the story that confirms it, then what do you do?
A: Then it's case dependent. If we think somebody has swallowed it, they're going to go to the emergency department. (*Id.* at 74, 81).

Plaintiff cites to a report by the Cuyahoga County Sheriff's Department as evidence that Dr. Tallman knew that Sharp was suspected of having swallowed drugs. The report discusses the investigation into Sharp's death and states:

On Wednesday March 25, 2015 a confidential jail informant, William Young, SO #0278966, revealed that SHARP was one of four prisoners who had possibly received heroin in a small plastic bag from another prisoner who was being booked into the Corrections Center. Dr. Thomas Tallman, Jail Medical Director, had learned of this information and ordered SHARP examined to determine if he had ingested the heroin. Two X-rays were taken and were negative. Sharp was administered a laxative and his bowel movement had no evidence of drugs. Sharp denied involvement with the alleged drugs to medical staff and was returned to his cell at 1900 hrs.

Sergeant Christopher Kozub is identified as having filed the report, but when Plaintiff deposed Sgt. Kozub, he testified that he did not participate in the investigation, did not contribute to the report, and did not know who wrote the sentence that states that Dr. Tallman ordered Sharp to be examined to determine if he had ingested heroin.[12] (Kozub Dep. 5, 7, 13). Plaintiff provides no evidence of who actually wrote the report or who provided the information regarding Dr.

_____

[12]    Sgt. Kozub testified that he believed two other detectives, Detective Jerman and Mancini, handled the investigation. (Kozub Dep. at 5). Plaintiff did not submit any testimony from either detective.

22

Tallman. Nor does Plaintiff identify any other evidence indicating that Dr. Tallman possessed information that would have given him reason to know or suspect that Sharp had ingested heroin.

Based on the evidence in the record, Plaintiff has not shown that a genuine dispute of material fact exists that Dr. Tallman subjectively perceived facts giving rise to an inference that Sharp had ingested heroin, that he actually drew that inference, or that he consciously disregarded the risk. The unauthenticated Sheriff's Department report is insufficient to create such a dispute of fact. Rather, the evidence shows that Dr. Tallman was aware only that Sharp had been accused of possibly concealing drugs in his rectum. After the X-rays did not reveal any foreign objects and Sharp had been administered magnesium citrate, Dr. Tallman determined that there was no need to send him to the emergency department or order a different type of scan.[13] Even assuming that Dr. Tallman was unaware of whether Sharp's bowel movement had been inspected, given the knowledge that he did have, he did not act with deliberate indifference in determining that Sharp could be cleared to return to his cell. "[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." *Estelle v.*

_____

[13]    Plaintiff cites to the deposition testimony of her expert, Dr. Famiglio, to argue that an X-ray was inadequate for determining if an inmate has hidden contraband in his or her body. (Doc. 99, at 14). As Defendants point out, Dr. Famiglio, is not a radiologist so is not qualified to offer an opinion on which radiology study would have been the most appropriate under the circumstances. Fed. R. Evid. 702. Dr. Famiglio also noted that, contrary to Sharp's X-ray, the X-ray of inmate Cross did, in fact, reveal something suspicious in his rectal area. (Famiglio Dep. at 89-90). Moreover, as discussed below, Plaintiff has cited no case supporting her position that Dr. Tallman acted with deliberate indifference by ordering an X-ray rather than a CT scan.

*Gamble*, 429 U.S. 97, 107, 97 S. Ct. 285, 293 (1976). Finally, while Dr. Tallman did not personally examine Sharp, he testified that it was standard protocol for him to proceed based on reports from a nurse practitioner or physician's assistant who is treating the patient. (Tallman Dep. at 56).

For all of these reasons, Plaintiff has failed to show that Dr. Tallman was deliberately indifferent to Sharp's serious medical needs by refusing to "verify underlying facts that [he] strongly suspected to be true, or declin[ing] to confirm inferences of risk that [he] strongly suspected to exist." *Hinneburg*, 2017 WL 218885, at *4.

c. Nurse Harris

Plaintiff claims that nurse Harris had the requisite subjective culpability because he was aware that drugs and contraband were increasingly being brought into the jail and he had frequently encountered prisoners who had swallowed or keistered illegal drugs. Despite this knowledge, she asserts that Harris acted with deliberate indifference by merely assuming that Sharp was in the dispensary for keistering drugs without asking Sharp or any medical staff as to why he was there, not taking Sharp's vitals, and not investigating the cause of Sharp's apparent distress. She complains that he did not explain to Sharp what the magnesium citrate would do or why he was giving it to him or obtain the required form from Sharp consenting to such treatment. He did not enter a note in Sharp's medical records that he had administered the medication and there is no documentation that Harris verified whether Sharp had a bowel movement or whether it produced any drugs.[14] Finally, she argues that Harris did not send Sharp

---

[14]     Plaintiff also cites to Gill's and Dancie's testimony that there was talk amongst the jail staff that Sharp had swallowed something, but as noted above, neither Gill nor Dancie testified as to when this talk occurred. Moreover, Plaintiff does not

to the emergency room but instead sent him to solitary without any further medical care. (Doc. 98, at 14).

Plaintiff has not created a genuine dispute of fact that Harris acted with deliberate indifference. Harris arrived in the dispensary after Sharp had been there for about an hour, and Harris was not Sharp's primary nurse, (Harris Dep. at 21-22), so it is reasonable that he did not take Sharp's vitals. Moreover, Harris testified that no one took Sharp's vitals because he was not in the dispensary based on his own complaint. (*Id.* at 54). Although Dancie and Gill testified that Sharp did not look well, Gill merely testified that she "thinks" Harris was in the area at this time and neither of them informed Harris of their observations. In addition, Dancie testified that she made her observations after Harris administered the magnesium citrate, which can cause cramping and intestinal discomfort. (Luethy Dep. at 69-70).

While Harris did not ask why Sharp was in the dispensary, he assumed that Sharp was there for hiding drugs in his rectal vault because SRT was in the dispensary and he is "almost certain" that someone used the word "keister." (*Id.* at 44). He did not think that Sharp or the other inmates were believed to have swallowed anything. (*Id.*). Moreover, when Harris gave Sharp the magnesium citrate, Sharp adamantly denied having any drugs. (*id.* at 45).

Although Harris did not document that Sharp had a bowel movement, Plaintiff's expert agrees that the administration of magnesium citrate after an X-ray was appropriate and that the magnesium citrate would have forced a keistered bag out of Sharp's rectum. (Luethy Dep. at 67-68). Harris's failure to obtain the required form with Sharp's consent or chart the administration

---

cite any evidence to show that nurse Harris was aware of such talk, particularly during the time that he was treating Sharp.

of the magnesium citrate is not a constitutional violation. *Smith v. Erie County Sheriff's Dept.*, 603 Fed. Appx. 414, 421 (6th Cir. 2015) ("Failure to comply with jail policy is not a *per se* constitutional violation."). Although Harris should have explained the purpose of the magnesium citrate to Sharp, at best, his failure to do so constitutes negligence.[15] Given Harris's minimal involvement with Sharp and his understanding as to why Sharp was in the dispensary, he did not act with deliberate indifference in not sending him to the emergency room. Finally, contrary to Plaintiff's assertion, it was not Harris's decision to send Sharp to segregation. Once medical cleared Sharp, Sgt. Brewer placed Sharp in administrative detention. (Brewer Dep. at 42, 49, 55-57). For these reasons, Harris is entitled to summary judgment.

### d. Officer Anderson

Plaintiff has produced no facts from which a reasonable juror could conclude that Officer Anderson subjectively perceived any facts giving rise to an inference that Sharp was at serious risk to his health, that he actually drew that inference, or that he consciously disregarded the risk. Officer Anderson testified that he was not told that Sharp was suspected of having heroin in his system, and that he was never aware and never suspected that Sharp had drugs in his system. (Anderson Dep. at 58, 66, 74).[16] While Anderson testified that "supervisors" were aware that Sharp had been suspected of having drugs in his system, his testimony does not state that he was aware of this fact at the time that Sharp was in his pod or if he became aware of it later. (*Id.* at

---

[15]    The Court notes that Gill testified that Harris informed Sharp that the magnesium citrate would make him go to the bathroom. (Gill Dep. at 36).

[16]    Officer Anderson testified that when inmates are placed in 10A, no special instructions are given to corrections officers about any of the details of why they are there. (Anderson Dep. at 66).

58). The only testimony that Anderson gave regarding his own knowledge at the time of Sharp's incarceration on his pod was that he was not aware of, and did not suspect that, Sharp had drugs in his system. Plaintiff notes that Anderson was generally aware that contraband had been smuggled into the jail, but she cites no evidence that Anderson had any reason to suspect that Sharp had been suspected of keistering or ingesting drugs. Nor does anything in the record suggest that Sharp acted out of the ordinary, informed Anderson that he was not feeling well, or requested any medical attention. When Anderson performed his cell-to-cell check at 6:40 p.m., Sharp told him that he had had a bad day because he was there under "false allegations" and requested a Bible, but he did not inform Anderson that he was in distress.

Plaintiff argues that Anderson violated the minimum duty of care by assuming that Sharp was sleeping without verifying that he was breathing during his observations. But given Anderson's lack of knowledge that Sharp had drugs in his system, his failure to perform a more thorough observation of Sharp during his rounds was not unreasonable. To the contrary, the Sixth Circuit has held that when officers perform regular observations of inmates, it is "further proof that no reasonable juror could find [that they] acted unreasonably." *Smith v. Erie County Sheriff's Dep't*, 603 Fed. Appx. 414, 420-21 (6th Cir. 2015) (noting that officers checked on intoxicated inmate every twenty-five minutes). Here, Anderson checked on Sharp every ten minutes. Finally, immediately upon discovering that Sharp was unresponsive, Anderson called out a medical emergency on his radio. For these reasons, Plaintiff has failed to produce any evidence that Officer Anderson acted with deliberate indifference.

### B. Qualified Immunity

Even if Plaintiff could prove that the Individual Defendants acted with deliberate

27

indifference, they would be entitled to qualified immunity. Qualified immunity can shield an official from suit when he "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599 (2004). If a defendant raises qualified immunity as a defense, the plaintiff bears the burden of demonstrating that it does not apply. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

In deciding whether an officer is entitled to qualified immunity, a court's first step is to determine whether a constitutional violation has occurred. *Neal v. Melton*, 453 Fed. Appx. 572, 575 (6th Cir. 2011). If a constitutional violation occurred, the court then asks whether that right was clearly established in light of the specific circumstances of the case. *Id.* Qualified immunity is appropriate "if the law is not sufficiently clear such that a reasonable officer would be on notice that his conduct is clearly unlawful." *Id.* at 576. To show that the law was clearly established, "a plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Arrington-Bey v. City of Bedford Heights, Ohio,* –F.3d–, 2017 WL 2432389, at *3 (quoting *White v. Pauly*, –U.S.–, 137 S. Ct. 548, 552 (2017)). Immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Pauly*, 137 S. Ct. at 551.

The Court has already concluded that the Individual Defendants did not violate Sharp's rights under the Fourteenth Amendment. But even if they had, they would be entitled to qualified immunity because Plaintiff has failed to meet her burden on the second step of the analysis. Plaintiff argues that the Supreme Court has long held that the deliberate indifference of prison officials to the serious medical needs of a convicted prisoner or the denial of medical care

violates a prisoner's right to be free from cruel and unusual punishment. "But '[c]learly established law' may not be defined at such a 'high level of generality.'" *Arrington-Bey*, 2017 WL 2432389, at *3. Plaintiff does not identify any Sixth Circuit or Supreme Court case with a similar fact pattern that would have given fair warning to the Individual Defendants that they needed to provide more medical care to Sharp than they did. Here, the evidence shows that the Individual Defendants, at most, suspected that Sharp had keistered drugs. None of them observed him ingesting drugs. Sharp denied having any drugs, denied having keistered them, and did not ask for any medical attention. Nevertheless, he was sent to the medical dispensary for examination. While there, he was coherent and conversed with staff and walked around the rooms in the dispensary. Plaintiff has produced no evidence that any of the Individual Defendants was aware that he was in physical distress. Despite Sharp's denials of having any drugs, an X-ray was ordered, which revealed no foreign objects in Sharp's abdomen, and Sharp was administered magnesium citrate, which would have cleared any keistered bags in his rectum.[17] Once cleared to return to the pod, he was observed every ten minutes. These actions are consistent with–and even go beyond–those of the officers in the cases discussed above where the Sixth Circuit has held that the officers did not act with deliberate indifference. While Plaintiff believes that Sharp should have been sent to the emergency room for a CT scan, the Supreme Court has held that a medical decision not to order certain procedures does not represent cruel and unusual punishment but is at most medical malpractice. *Estelle v. Gamble*, 429 U.S. 97, 107,

---

[17]     *See Booker v. LaPaglia*, 617 Fed. Appx. 520, 532 (6th Cir. 2015) (Moore, J., dissenting) (in ruling on a Fourth Amendment claim, noting that an X-ray and laxative are reasonable ways to prevent a prisoner from secretly bringing contraband into a prison).

97 S. Ct. 285, 293 (1976). Similarly, she argues that Sharp's medical charting was inadequate, but she has cited no case where inadequate charting rose to the level of deliberate indifference.

Thus, even if the Individual Defendants had violated Sharp's constitutional rights, they are entitled to qualified immunity.

### C. Section 1983 claim against the County and MetroHealth

Plaintiff also brings claims against the County and MetroHealth and against Dr. Tallman and nurse Kempe in their official capacities under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 98 S. Ct. 2018 (1978).[18] Under *Monell,* a municipality can be liable under § 1983 when an official "policy or custom" caused a violation of the plaintiff's constitutional rights. There can be no liability under *Monell* without an underlying constitutional violation. *See Robertson v. Lucas*, 753 F.3d 606.622 (6th Cir. 2014). Similarly, a municipality can only be liable under *Monell* in a deliberate indifference case if the violated right is clearly established "because a municipality cannot *deliberately* shirk a constitutional duty unless that duty is clear." *Arrington-Bey*, 2017 WL 2017 WL 2432389, at *5.

Here, Plaintiff cannot show that Sharp's constitutional rights were violated or that his alleged violated right was clearly established. As such, her claims against the County and MetroHealth fail.

### D. State law claims

Plaintiff's state law claims also fail. With respect to her claims against Cuyahoga County

---

[18] When a plaintiff sues local government officials and employees in their official capacity, the suit is treated as one against the municipality. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

and MetroHealth, both are political subdivisions that are entitled to the immunities in Ohio Revised Code § 2744.02. Chapter 2744 sets forth a three-tiered analysis for determining whether a political subdivision is immune from liability in a civil action. Initially, § 2744.02(A)(1) grants immunity to a political subdivision from liability in a civil action for injury, death, or loss to persons allegedly caused by an act or omission of the subdivision or its employees in connection with a governmental or proprietary function. The operation of a jail is a governmental function. Ohio Rev. Code § 2744.01(C)(2)(h). Providing health care services in a county jail is also a governmental function. Any function that the general assembly mandates a political subdivision to perform is a governmental function. *Id.* at § 2744.01(C)(2)(x). Ohio Administrative Code § 5120:1-8-09 requires that full-service jails "provide twenty-four hour emergency medical, dental, and mental health services." Thus, unless an exception applies, the County and MetroHealth are immune from Plaintiff's state law claims. *See Hile v. Franklin Co. Bd. of Comm'rs*, 2005 WL 3557454, as amended nunc pro tunc (Ohio App. Jan. 5, 2006). The exceptions to immunity are: negligent operation of a motor vehicle, negligent operation of a proprietary function, failure to keep public roads in repair, injury due to a physical defect on government property, and liability expressly imposed by the Ohio Revised Code. None of these exceptions apply; therefore, the County and MetroHealth are entitled to statutory immunity.

The Individual Defendants are also entitled to statutory immunity. Ohio grants immunity to public officials unless their "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). As relevant here, recklessness is conduct "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is

substantially greater than negligent conduct." *Argabrite v. Neer*, 149 Ohio St. 3d 349, 351

(2016). "Wanton misconduct is the failure to exercise any care toward those to whom a duty of

care is owed in circumstances in which there is a great probability that harm will result."

*Anderson v. Massillon*, 134 Ohio St. 3d 380, 388 (2012). "Malicious purpose encompasses

exercising 'malice,' which can be defined as the willful and intentional design to do injury, or

the intention or desire to harm another, usually seriously, through conduct that is unlawful or

unjustified."*Wingfield v. Cleveland*, 2014 Ohio 2772, ¶ 20. For the reasons discussed above,

Plaintiff has not produced any evidence that the Individual Defendants' actions meet any of these

definitions. Rather, the evidence shows that they acted appropriately under the circumstances

and given the knowledge that they had. While Sharp's death was certainly a tragic event, it was

not the result of Defendants' wanton, reckless, or malicious actions.

### CONCLUSION

For the foregoing reasons, MetroHealth System, Dr. Thomas Tallman, and Elizabeth

Kempe, CNP's Motion for Summary Judgment (Doc. 81) and Defendant Cuyahoga County,

Marcus Harris, RN, and Corrections Officer Zackary Anderson's Motion for Summary Judgment

(Doc. 87) are GRANTED. Defendants Cuyahoga County, Marcus Harris, RN, and Zackary

Anderson's Motion to Strike Non-Evidentiary Materials Cited in Plaintiff's Opposition to

Summary Judgment and Motion to Quash Subpoena to Defense Expert, Jeff Eisner (Doc. 107) is

GRANTED in part and DENIED in part as moot.

IT IS SO ORDERED.

 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge
Dated: 6/30/17                    Chief Judge